# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50431 | **DATE** | 12/9/2003 |
| **CASE TITLE** | | Royster vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | DEC - 9 2003 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | docketing deputy initials |
| | | 12/9/2003 |
| | courtroom deputy's initials | date mailed notice |
| sp | | sp |

U.S. DISTRICT COURT
CLERK
03 DEC -9 PM 3: 27
FILED-K3

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

NORMAN J. ROYSTER,                      )
                                        )
    Plaintiff,                          )        Case No. 02 C 50431
                                        )
    v.                                  )        Magistrate Judge
                                        )        P. Michael Mahoney
JO ANNE B. BARNHART,                    )
COMMISSIONER OF SOCIAL                  )
SECURITY,                               )
                                        )
    Defendant.                          )

### MEMORANDUM OPINION AND ORDER

Norman J. Royster ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the

"Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate Judge pursuant to consents

filed by both parties on April 2, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### I. BACKGROUND

Plaintiff filed for DIB on December 7, 2000. (Tr. 36-37). Plaintiff's application for

benefits was denied on April 4, 2001. (Tr. 42-45). On April 20, 2001, Plaintiff filed a request

for reconsideration. (Tr. 46). Plaintiff's request for reconsideration was denied on November

13, 2001. (Tr. 48-51). Plaintiff then filed a request for a hearing before an Administrative Law

Judge ("ALJ") on November 16, 2001. (Tr. 52). Plaintiff appeared, with counsel, before an ALJ

on June 18, 2002. (Tr. 12). In a decision dated June 28, 2002, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 12-19). On July 3, 2002, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 7). On October 11, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 5-6).

## II. FACTS

Plaintiff was born on April 12, 1950, and was fifty-two years old at the time of his June 28, 2002, hearing before the ALJ. (Tr. 19). Plaintiff completed his education through the seventh grade. (Tr. 176). At the time of the hearing, Plaintiff lived with his wife in a single-family residence. (Tr. 175). Plaintiff had no reported income since January 1, 2000. (Tr. 74).

Plaintiff worked for The Essex Group, Inc. ("Essex") as a shipping and handling clerk from May 1981 until September 1994. (Tr. 90). Plaintiff loaded and unloaded trucks, operated a forklift, and performed other general duties typical in a shipping department. (Tr. 91). Plaintiff received ten dollars per hour for his services. (Tr. 91). In 1991, Plaintiff suffered an on-the-job-injury and underwent back surgery. (Tr. 151). Plaintiff testified that he returned to work at Essex at some point in 1993 and reinjured his back at work within a week of returning to Essex. (Tr. 181). Plaintiff's employment with Essex ended in September 1994. (Tr. 90).

Plaintiff was self-employed from 1994-95 as an unarmed security guard for a realtor. (Tr. 74, 177). Plaintiff did not recall this employment. (Tr. 177). In 1994, Plaintiff earned $1,188 as a self-employed security guard. (Tr. 74). In 1995, Plaintiff's earnings from this self-employment rose to $4,061. (*Id.*).

Plaintiff worked from 1995-99 as a security guard for Clock Tower Properties ("Clock Tower"). (Tr. 74). Plaintiff's duties as a security guard for Clock Tower consisted of placing

2

notices on illegally parked cars. (Tr. 177). Plaintiff testified that he reported to work in the morning and spent approximately one to two hours per day[1] patrolling the properties belonging to Clock Tower. (Tr. 177). Plaintiff spent most of his time seated in a truck waiting to observe parking violations. (Tr. 178). Upon witnessing a violation, Plaintiff would drive up to the illegally parked car and exit his truck to issue the parking notice. (*Id.*). Clock Tower paid Plaintiff six to seven dollars per hour for Plaintiff's services. (Tr. 177). In 1995, Plaintiff earned $988.50 from Clock Tower. (Tr. 74). Plaintiff's earnings from Clock Tower peaked in 1996 at $6,586.80, declined to $5,126.54 in 1997, declined further to $3,091.64 in 1998, and finished at $333.14 in 1999. (*Id.*). Clock Tower eliminated Plaintiff's position in 1999. (Tr. 178). Plaintiff applied for no other employment after 1999. (*Id.*).

Plaintiff testified that he is unable to work due to debilitating back pain. (Tr. 178). Plaintiff described periodic episodes of sharp pain in his lower back and numbness in his right leg. (Tr. 182). Plaintiff takes prescription medication to help control his pain. (*Id.*). Plaintiff's typical day includes reading the newspaper, watching television, sitting on his outdoor deck, and taking naps. (Tr. 184). Plaintiff does not cook meals, clean, do laundry, do yard work, grocery shop, exercise, patronize movie theaters, attend religious services, engage in any hobbies, or take vacations. (Tr. 185-86). Plaintiff's wife helps Plaintiff wash his feet and put on socks and shoes. (Tr. 15, 185).

The ALJ asked Vocational Expert Frank Mendrick to describe Plaintiff's past work. (Tr. 190). Mr. Mendrick, referencing the *Dictionary of Occupation Titles*, testified that Plaintiff's

---

[1] Plaintiff's income records suggest Plaintiff worked more than two to three hours per day. (Tr. 193). In 1996, Plaintiff earned $6,586.80 from his employment at Clock Tower. (Tr. 74). If Plaintiff worked every single day in 1996 (which was a leap-year containing 366 days), he would have earned eighteen dollars per day. If Plaintiff's testimony that he earned six to seven dollars per hour from Clock Tower is correct, Plaintiff would have had to work a minimum of two-and-one-half hours every single day of 1996 to earn the money he did.

position at Essex as a shipping and handling clerk was semi-skilled and, as performed by Plaintiff, very heavy work. (Tr. 191). Mr. Mendrick further testified Plaintiff's work as a security officer qualified as light, unskilled work. (*Id.*) The ALJ then asked Mr. Mendrick whether a hypothetical person possessing certain physical characteristics could perform Plaintiff's previous employment. (Tr. 191). Specifically, the ALJ asked Mr. Mendrick to

> [a]ssume on the basis of the record, an individual who was 52 years old, has the work experience and education of this Claimant and has the following exertional limitations, could sit for six hours, stand and walk for six hours, lifting, carrying frequently up to 10 pounds, occasionally up to 20 pounds. Could only occasionally stoop and crawl and climb ladders, ropes and scaffolds. Further, could only occasionally crouch or kneel. Could such a person perform Claimant's past work?

(*Id.*). Mr. Mendrick testified that such a hypothetical person could perform Plaintiff's previous security guard duties, but not Plaintiff's prior employment as a shipping and handling clerk. (*Id.*).

The ALJ then inquired as to other jobs that the above hypothetical person could perform. (*Id.*). Mr. Mendrick testified that this person would be able to perform general assembly work, general inspection work, and general machine tender or feeder work. (Tr. 191-92). According to the vocational expert, an individual possessing the residual functional capacity ("RFC") of the hypothetical person is capable of doing 33,000 jobs in the six county Chicago metropolitan area plus Winnebago and Boone counties. (*See id.*).

## III. **MEDICAL HISTORY**

In 1991, Plaintiff suffered a back injury while lifting a spool of wire during his employment with Essex. (Tr. 151). Although unclear from the record, it appears that in 1991 a

4

Dr. Soriano performed a surgical laminectomy on Plaintiff to treat Plaintiff's lumbar disc herniation at the L3-4 levels. (Tr. 15, 151). Plaintiff engaged in a physical therapy/work hardening program in 1992 and returned to work at Essex in 1993. (Tr. 15, 151, 181). Plaintiff left Essex permanently in September 1994 after injuring his back again sometime in 1993. (Tr. 181).

Plaintiff alleges that he suffers from debilitating back pain and that this debilitating pain caused him to become disabled on April 11, 2000. (Tr. 174, 182). Plaintiff's regular physician Harry W. Darland, M.D., treated Plaintiff from May 1997 through May 2002. (Tr. 15-16). Dr. Darland treated Plaintiff "conservatively" with prescribed medications for lower back pain, weight loss, numbness and tingling in Plaintiff's right leg, hypertension, and depression (for which Plaintiff takes Prozac). (*Id.*). Dr. Darland reported to the SSA in December 1998 that Plaintiff suffered from lumbar disc disease, osteoarthritis, and spinal stenosis. (Tr. 143-48). These ailments caused Plaintiff pain and significantly restricted his mobility. (*Id.*).

On July 21, 2000, personnel at Rockford Memorial Hospital performed a computerized tomography ("CT") scan on Plaintiff's lower back. (Tr. 149). The CT scan revealed that Plaintiff had lower facet arthritis without any significant focal disc disease and no focal disc herniations. (*Id.*). The scan also suggested the possibility of greater disc disease in the upper lumbar levels, which were not the focus of the July 21, 2000, CT scan. Dr. Kevin Tribble, who dictated the CT scan report, recommended that plaintiff undergo a lumbar magnetic resonance imaging ("MRI") scan to allow an evaluation of his upper lumbar levels. (*Id.*).

Dr. Darland requested Norm A. Hagman, M.D., an orthopedic surgeon with Rockford

Orthopedic Associates, Ltd., to examine Plaintiff. (Tr. 151). Dr. Hagman examined Plaintiff on

December 20, 2000. (*Id.*). Dr. Hagman found no evidence of obvious disc protrusion, but did

find very mild disc bulging. (Tr. 152). Dr. Hagman also found no evidence of muscle atrophy in

Plaintiff's lower extremities. (*Id.*). Dr. Hagman recommended that Plaintiff undergo an MRI

scan of the entire lumbar spine to rule out upper lumbar disc disorders. (*Id.*). Personnel at

Rockford Memorial Hospital performed the recommended complete lumbar MRI on January 9,

2001. (Tr. 153). The MRI scan revealed the presence of multilevel lumbar spondylosis and no

evidence of significant central canal or neural foraminal stenosis. (Tr. 154). Dr. Hagman

reviewed the MRI results with Plaintiff on January 18, 2001. (Tr. 155). Dr. Hagman found the

MRI scan to be "rather benign." (*Id.*). Dr Hagman did not believe further surgery would benefit

Plaintiff and suggested Plaintiff could benefit from using proper lifting techniques and

exercising proper pelvic posture. (*Id.*).

On March 15, 2001, a physician[2] with the Illinois Disability Determination Services

("DDS") completed a physical residual functioning capacity assessment for Plaintiff. (Tr. 158-

65). This physician concluded that Plaintiff could occasionally lift and/or carry twenty pounds,

frequently lift and/or carry ten pounds, stand or walk with normal breaks for about six hours in

an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and push

or pull for unlimited periods with the lift and carry weight limitations. (Tr. 159). A second DDS

physician reviewed and affirmed this assessment on November 1, 2001. (Tr. 165).

---

[2] The names of the physicians from DDS are not legible on the forms in the record.

Dr. Darland completed a spinal disorders report on Plaintiff for review by DDS on

October 23, 2001. (Tr. 156-57). Dr. Darland reported that Plaintiff suffered from disc disease,

central and foraminal stenosis, osteoarthritis, and neuritis. (Tr. 157). Because of these ailments,

Dr. Darland indicated that Plaintiff has lower back pain and sensory loss in his right and left legs

from thigh to calf. (*Id.*). Also according to Dr. Darland's assessment, Plaintiff's Lumbosacral

Spine flexion was 45-55 (normal being 90) and his Lumbosacral Spine extension was 2-30

(normal being 30). Finally, in answering the extent of Plaintiff's ability to do work-related

activities such as sitting, standing, moving about, lifting, carrying, and handling objects, Dr.

Darland reported that, in his opinion, Plaintiff was not able to lift, stand, or walk for more than

twenty to thirty minutes. (*Id.*).


IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the

court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or

substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir.

1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the

evidence, resolve material conflicts, make independent findings of fact, and decide the case

accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable

minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision

rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the

Commissioner's decision is supported by substantial evidence, it is conclusive and this court

must affirm. 42 U.S.C. §405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

"Substantial evidence" is "evidence which a reasonable mind would accept as adequate to

support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary

determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting

evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d

1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion

that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863,

874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness

credibility determination is based upon the ALJ's subjective observation of the witness, the

determination may only be disturbed if it is "patently wrong" or if it finds no support in the

record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993). "However, when such

determinations rest on objective factors of fundamental implausibilities rather than subjective

considerations, [reviewing] courts have greater freedom to review the ALJ's decision." *Herron v.

Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V.     **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and

accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A

8

physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[3] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

---

[3]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[4] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who

---

[4]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. <u>ANALYSIS</u>

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on June 28, 2002. (Tr. 12-19). The ALJ found that Plaintiff had not engaged in any employment after April 11, 2000, the alleged onset date of disability.(Tr. 13).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found that Plaintiff suffers from a back injury and is unable to bend from the waist, sit, lift, or stand for any prolonged period of time. (Tr. 15). Additionally, Plaintiff suffers from increased numbness and tingling in his right leg. (*Id.*). Finally, Plaintiff suffers from an adjustment disorder, high blood pressure and high cholesterol levels. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it.

C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. Specifically, the ALJ first noted that Plaintiff's "back impairment is not accompanied by the neurological deficits required by section 1.04A, nor does the record contain other findings of equivalent severity." (Tr. 13). Next, the ALJ proceeded to thoroughly evaluate Plaintiff's adjustment disorder by meticulously going through Listing 12.04 and the requisite parts. Specifically, the ALJ found that because Plaintiff had no restrictions in activity of daily living, no difficulties in maintaining concentration, persistence or pace, no episodes of decompensation, and only mild difficulties in maintaining social functioning, section B of Listing 12.04 was not satisfied. After finding section B not satisfied, the ALJ then proceeded to determine that section C of Listing 12.04 is not satisfied either because Plaintiff has not experienced repeated episodes of decompensation, a residual disease process, or one or more years inability to function outside a highly supportive living arrangement. (Tr. 14). This court is grateful to review such a thorough analysis as it makes the ALJ's logic easy to follow.

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

Before reaching the step-four analysis, the ALJ paused in her opinion to establish Plaintiff's RFC. (Tr. 14). The ALJ considered Plaintiff's allegations of disabling symptoms and limitations, medical records maintained by Dr. Darland, Plaintiff's July 2000 CT scan, Dr. Hagman's December 2000 orthopedic examination, Plaintiff's January 2001 MRI, the Spinal Disorders Report completed by Dr. Darland in October 2001, and the residual functioning reports completed by DDS in March 2001 and affirmed in November 2001. (Tr. 15-16). The ALJ found Plaintiff's claims of total disability not credible. (Tr. 16). The ALJ found Plaintiff's medical treatment to be "routine and/or conservative in nature," that his symptoms were effectively controlled by medication, and that Plaintiff's alleged daily activities could not be objectively verified and attributed to the alleged disability, as opposed to other reasons. (Tr. 17). In addition, the ALJ found Dr. Darland's opinion to be inconsistent with the opinions of the other examining and reviewing physicians. (Tr. 16). Furthermore, the ALJ considered the course of treatment pursued by Dr. Darland to be "[in]consistent with what one would expect if [Plaintiff] were truly disabled." (*Id.*). Based on the above, the ALJ determined that Plaintiff's symptoms and limitations preclude the following work-related activities:

> lifting more than 20 pounds occasionally or more than 10 pounds frequently; sitting, standing and walking for more than six hours in an eight-hour day; stooping more than occasionally; crawling more than occasionally; crouching more than occasionally; kneeling more than occasionally; and climbing ladders, ropes and scaffolds more than occasionally.

14

(Tr. 15). The ALJ then performed the step-four analysis to determine whether Plaintiff's severe impairments prevented Plaintiff from engaging in past relevant work. (Tr. 17). Based on the testimony of the vocational expert and the exertional and nonexertional requirements of a job consistent with Plaintiff's RFC, the ALJ found Plaintiff's security position at Clock Tower to be past relevant work that Plaintiff could perform consistent with his RFC. (Tr. 17). The ALJ concluded that Plaintiff therefore was not disabled and denied his application for benefits consistent with 20 C.F.R. §404.1520(a), (e). (Tr. 18-19). Plaintiff challenges this finding.

Plaintiff asserts that the ALJ erred in making her step-four finding because (1) the ALJ's determination in her written opinion that Plaintiff's security guard employment constituted past relevant work was simply a conclusory declaration; and (2) the alleged past relevant work did not actually constitute SGA. (Pl.'s Mot. for Summ. J. at 4, 8). Plaintiff's arguments have no merit.

As for the first argument, the Seventh Circuit requires that an ALJ minimally articulate his or her reasoning so that a review court can follow their path of reasoning. *Walker*, 834 F.2d at 643. While the ALJ could have articulated her reasoning more thoroughly, the ALJ's step-four decision is supported by substantial evidence in the administrative record and her path of reasoning is clear after review of the record. Therefore, the ALJ's decision will be affirmed.

Plaintiff's second argument is that Plaintiff's prior work as a security guard in 1996 was not SGA, and therefore not past relevant work. (Pl.'s Mot. for Summ. J. at 8-9). "SGA" is work activity that involves significant physical or mental activities that a claimant does for pay or profit. 20 C.F.R. § 404.1572(a)-(b). The Commissioner presumes that a claimant's work is

SGA if the claimant's average monthly earnings exceed the amount listed in Table 1 in

§ 404.1574. 20 C.F.R. § 404.1574(b)(2)(i). Table 1 establishes that a claimant whose average

monthly earnings exceed $500 per month during January 1990 through July 1999 is presumed to

have engaged in SGA. *Id.* Excluded from the calculation of average monthly earnings are

earnings derived from unsuccessful work attempts, earnings not directly related to the claimant's

productivity, and certain earnings obtained from employment performed in a sheltered or special

environment. 20 C.F.R. § 404.1574(a).

Plaintiff concedes that in 1996 he earned $6,586.80 from his Clock Tower employment

and that his average monthly earnings in 1996 of $548.90 exceeded the $500 threshold listed in

Table 1 for earnings between January 1990 and July 1999 that creates a presumption of SGA.[5]

(Pl's Mot. for Summ. J. at 7). However, Plaintiff argues that his 1996 earnings from his security

guard employment should be excluded from an average monthly earnings calculation because he

performed that employment under conditions that qualified as a sheltered or special

environment. (*Id.* at 8). Plaintiff further contends that his 1996 position was not "substantial"

within the meaning of the SGA definition. (*Id.* at 9).

Employment performed under "special conditions" may not qualify as SGA. 20 C.F.R. §

404.1573(c). Examples of such special conditions include situations where an employee: (1)

requires and receives special assistance from other employees; (2) is allowed to work irregular

hours or take frequent rest periods; (3) is provided with special equipment or assigned work

specially suited to the employee's impairment; (4) is able to work only because of specially

---

[5] Plaintiff does not raise, and the court does not consider, the question of whether Plaintiff's income was properly averaged under 20 C.F.R. § 404.1574a.

arranged circumstances; (5) is allowed to work at a lower standard of productivity or efficiency as compared to other employees; and (6) is given the opportunity to work despite the employee's impairment because of a family relationship, past association with the employer, or the employer's concern for the employee's welfare. 20 C.F.R. § 404.1573(c)(1)-(6). Since the burden of proof is on Plaintiff to demonstrate that he is not capable of performing past relevant work, Plaintiff bore the burden in the administrative hearing of proving by a preponderance of the evidence that he performed his security guard employment under any of the above special circumstances. *See Young* v. *Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. § 30.111.

Plaintiff maintains that he performed his 1996 security guard employment under the special conditions of requiring and needing special assistance, being allowed to work irregular hours or take frequent breaks, being assigned work specially suited to his impairment, and being given the opportunity to work by an employer that had a family relationship or a past association with Plaintiff or that had a concern for Plaintiff's welfare. (Pl.'s Mot. for Summ. J. at 8). However, the only evidence in the record relating to Plaintiff's Clock Tower employment is his testimony that he ticketed illegally parked cars in the Clock Tower parking lot for about two hours each workday and that his employment ended when the Clock Tower "eliminated" his position. (Tr. 177-78). Plaintiff explained that "[i]t wasn't really -- my brother had worked there. They just kind of made it up to give me something to do." (*Id.*).

Plaintiff offered no evidence that he received any assistance in performing his security guard duties. Plaintiff offered no evidence that he worked irregular hours or that he was

17

permitted to take frequent breaks. Plaintiff testified only that he performed his work in the mornings for approximately two hours each workday. (Tr. 177). Plaintiff offered no evidence that the Clock Tower employment was specially suited to Plaintiff's impairments. Finally, Plaintiff offered scant evidence that Clock Tower hired Plaintiff because of a family relationship, past association, or concern for Plaintiff's welfare. This evidence consisted solely of Plaintiff's testimony, "my brother had worked there. They just kind of made it up to give me something to do." (Tr. 178). Plaintiff bore the burden of proof to establish that he could not perform past relevant work. *See* 20 C.F.R. § 30.111; 20 C.F.R. § 404.1520(a), (e); *Young*, 957 F.2d at 389. Plaintiff simply failed to convince the ALJ that he performed his Clock Tower employment under special conditions.

Plaintiff also asserts that his 1996 position was not "substantial" within the meaning of the SGA definition. (Pl.'s Mot at 9). A claimant's employment is considered "substantial" if it "involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). A claimant's work may be substantial "even if it is done on a part-time basis." *Id.* Since the regulations presume employment activity generating a certain amount of income to be substantial and gainful activity, and since Plaintiff concedes that his income from his Clock Tower position exceeded that amount, Plaintiff's security guard employment was substantial under the regulations. 20 C.F.R. § 404.1574(b)(2)(i), (Pl.'s Mot at 7). The ALJ's step-four determination that Plaintiff's impairments do not prevent him from engaging in past relevant work is supported by substantial evidence and therefore must be affirmed. A finding of not

disabled at step four eliminates the need to consider the fifth and final step in the Commissioner's analysis. 20 C.F.R. § 404.1520(a).

## VII. <u>CONCLUSION</u>

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 12/9/03

# United States District Court
## Northern District of Illinois
### Western Division

NORMAN J. ROYSTER

v.

JO ANNE BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 50431

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☑ Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. Judgment is entered in favor of Jo Anne Barnhart and against Norman J. Royster.

Michael W. Dobbins, Clerk of Court

Gale L. Graeff, Deputy Clerk

Date: 12/9/2003